## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEWIS JAMES FOGLE,

      Plaintiff,

v.

Pennsylvania State Police Troopers JOHN
SOKOL, MICHAEL STEFFEE, DONALD
BECKWITH, and JOSEPH STEPHEN,
Corporals JOHN BARDROFF and ANDREW
MOLLURA, and Lieutenant GLENN WALP,
in their individual capacities; COUNTY OF
INDIANA, PENNSYLVANIA; Indiana
County District Attorney GREGORY OLSON,
in his official and individual capacity; Indiana
County Assistant District Attorney WILLIAM
MARTIN, in his individual capacity,

      Defendants.

**Case No. _____**

**COMPLAINT AND JURY DEMAND**

Plaintiff LEWIS JAMES FOGLE, by his attorneys NEUFELD SCHECK & BRUSTIN, LLP,

and FARRELL & REISINGER, LLC, hereby alleges as follows:

### INTRODUCTION

1.    Plaintiff Lewis James Fogle ("Jim Fogle") spent nearly 35 years in prison for a crime he

did not commit before DNA testing conclusively proved his innocence.

2.    In 1976, 15-year-old Deann Kathy Long ("Kathy Long") was raped and murdered near

her home in Cherry Tree, Pennsylvania. The crime shocked the tightly-knit rural community, and

stumped the Pennsylvania State Police ("PSP") tasked with solving the crime. After four-and-a-

half years, with the investigation at a standstill, and pressure mounting to find the perpetrator,

PSP officers and Indiana County prosecutors engaged in multiple acts of misconduct to cobble

together a case by any means necessary. Jim Fogle was the victim of that malfeasance.

3.      Mr. Fogle is innocent of the rape and murder of Kathy Long. He had nothing to do with the crime. He has no knowledge of the real perpetrator or perpetrators.

4.      In order to close the case, PSP officers, led by Defendants John Sokol and Michael Steffee, relied on Earl Elderkin, who they knew was an unreliable, seriously emotionally-disturbed mental patient whom they could manipulate. Defendants enlisted an amateur hypnotist to help them obtain a statement from Elderkin that tracked Defendants' theory of the case. They then obtained a fabricated statement from Elderkin implicating four men whose names had surfaced during the investigation, including Jim Fogle and his brother Dennis Fogle.

5.      Defendants attempted to cover up their misconduct by hiding the fact that Elderkin's statement was the product of unacceptable hypnosis, and by fabricating additional evidence to corroborate Elderkin's account. Specifically, Defendants coerced and fabricated a false confession from Dennis Fogle that tracked Elderkin's statement. They also used coercion and/or improper suggestion to induce at least three other witnesses, including the elder sister of the murder victim, to change their earlier statements—which tended to exculpate Mr. Fogle—to eliminate inconsistencies with and otherwise corroborate Elderkin's statement.

6.      Despite Defendants' efforts to conceal the illegal hypnosis and the prior inconsistent statements of key witnesses, evidence of both were discovered during a preliminary hearing. As a result of this misconduct, the court later ruled that neither Elderkin's statement nor Dennis Fogle's fabricated confession could be used at trial.

7.      Given that ruling, the state had to abandon the prosecutions of three of their four defendants. But on the same day Elderkin's hypnosis and prior inconsistent statements were brought to light, Defendants fabricated the statements of two jailhouse informants who falsely

claimed that Jim Fogle had implicated himself in the crime. On the basis of those false statements, the wrongful prosecution against Jim Fogle was left intact.

8.      The day after the Court suppressed Elderkin's statement and Dennis Fogle's confession, Defendants fabricated a statement from a third jailhouse informant, and fed him details to ensure that the inculpatory statement would appear reliable.

9.      Jim Fogle was convicted of Kathy Long's rape and murder almost entirely on the basis of the testimony of these three informants and of the victim's sister, all of which were fabricated by or at the behest of Defendant PSP officers and/or Defendants Gregory Olson and William Martin, prosecutors from the Indiana County District Attorney's Office ("Defendant Prosecutors").

10.     Jim Fogle maintained his innocence at all times, and never stopped fighting for his release. Finally, in 2014, DNA testing on sperm collected from the young victim at autopsy proved that another man—and not Jim or Dennis Fogle—was responsible for the crimes.

11.     The current Indiana County District Attorney joined Mr. Fogle's motion to vacate his conviction, and formally moved to dismiss the charges against him, telling the court that the case against Mr. Fogle was without prosecutorial merit.

12.     On September 14, 2015, Jim Fogle finally won his freedom. He was 29 years old when he was imprisoned for Kathy Long's murder, and 63 at the time of his release. He now seeks redress for the misconduct that cost him the best years of his life.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

14.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

16.    Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

17.    Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

18.    Plaintiff LEWIS JAMES FOGLE is and was at all relevant times, a resident of the State of Pennsylvania. On February 26, 1982, Mr. Fogle was wrongfully convicted of the 1976 murder and rape of 15-year-old  Kathy Long and sentenced to life imprisonment. After spending more than three decades in prison, Mr. Fogle was finally released on August 13, 2015 after the Indiana County District Attorney agreed that Mr. Fogle's conviction should be vacated based on newly-obtained DNA evidence, and entered a Joint Stipulation for Post-Conviction Relief with the Court of Common Pleas, Indiana County.

19.    Defendant JOHN SOKOL, at all times relevant to this complaint, was a trooper with the Pennsylvania State Police ("PSP") acting under color of law. He was the prosecuting officer in the investigation of the murder of Kathy Long.

20.    Defendant MICHAEL STEFFEE was, at all times relevant to this complaint, a trooper with the PSP acting under color of law.

21.    Defendant GLENN WALP was, at all times relevant to this complaint, a lieutenant with the PSP, and the station commander of Troop A of the PSP.

22.     Defendant JOHN BARDROFF was, at all times relevant to this complaint, a corporal with the PSP acting under color of law.

23.     Defendant DONALD BECKWITH was, at all times relevant to this complaint, a trooper with the PSP acting under color of law.

24.     Defendant ANDREW MOLLURA was, at all times relevant to this complaint, a corporal with the PSP acting under color of law.

25.     Defendant JOSEPH STEPHEN was, at all times relevant to this complaint, a trooper with the PSP acting under color of law.

26.     Defendant GREGORY OLSON was, at all times relevant to this complaint, the District Attorney of Indiana County, Pennsylvania acting under color of law.

27.     Defendant WILLIAM MARTIN was, at all times relevant to this complaint, an Assistant District Attorney with the District Attorney's Office of Indiana County, Pennsylvania acting under color of law.

28.     Defendant COUNTY OF INDIANA was and is a county that is a political subdivision of the Commonwealth of Pennsylvania, was the employer of Defendants Gregory Olson and William Martin, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Indiana County District Attorney's Office.

## FACTUAL ALLEGATIONS

**15-year-old Kathy Long is raped and murdered**

29.     On the morning of July 31, 1976, the body of 15-year-old Kathy Long was discovered along a logging road in the woods, a short distance from her home near Cherry Tree, Indiana County, Pennsylvania. Ms. Long's body was found with her shorts and underwear pulled down to her ankles, and a gunshot wound to her head. Autopsy indicated that she had been raped and

shot at approximately the same time, sometime between the afternoon of July 30 and the early morning of July 31.

30.     The brutal rape and murder of a teenage girl rocked the tightly-knit community in rural western Pennsylvania. Rumors and gossip proliferated, with many in the community playing the role of armchair detectives and offering a variety of speculative theories and tips to the Pennsylvania State Police, the law enforcement agency that investigated the crime.

**Defendant State Troopers quickly establish the time and circumstances of Kathy Long's abduction.**

31.     Defendant State Trooper John Sokol was the prosecuting officer in charge of the murder investigation. Along with other PSP troopers, including most frequently Defendant Michael Steffee, Sokol actively pursued leads throughout the course of a five-year investigation into Kathy Long's death.

32.     PSP officers learned right away that Kathy was last seen getting into a blue car with an unknown man around 4 p.m. on July 30.

33.     Lola Long, Kathy's twelve-year-old sister, told police that at about 4 p.m. a man pulled up to the Long home in a blue car and asked to speak with "the oldest Long girl." Lola reported that as the man was pulling away from their house, Kathy, who was returning from spending the day at a friend's house, walked up the driveway, spoke with the man, then got into his car and they drove away.

34.     Interviews with four other people corroborated Lola's timeline: (1) Kathy's youngest sister, nine-year-old Rose, who also saw Kathy get into the car; (2) Kathy's oldest sister, seventeen-year-old Patty, and (3) one of Patty's friends, who along with Patty learned from Lola upon returning to the Long house around 4 p.m. that Kathy had left with a strange man; and (4)

the friend Kathy had spent the day with, who confirmed that Kathy left for home soon after 3 p.m., and was missing by around 5 p.m.

35.    Lola Long also gave police a detailed description of the man she saw drive away with Kathy the afternoon before her body was found. She described him as between 20 and 30 years old, with blue eyes, black hair that came below his ears and curled at the ends, sideburns, heavy eyebrows, and a heavy mustache over his upper lip. Rose Long corroborated this description.

36.    In 1976, Plaintiff Jim Fogle had straight reddish-blonde hair that dropped down his back and a matching, full beard that reached his waist. Dennis Fogle had short and curly red hair, and was clean shaven.

37.    The police created a composite drawing based on Lola Long's description and distributed it to local newspapers.

38.    PSP officers, including Defendants Sokol, Steffee, Beckwith, Stephen, Walp, Mollura, and Bardroff ("Defendant Officers"), spent the next several months trying to ascertain the identity of the man who had picked up Kathy sometime between 3 and 5 p.m. on the afternoon of July 30. They pursued several leads and conducted repeated interviews of potential witnesses and people of interest, but were unable to obtain a single solid lead.

**Early investigation into Plaintiff Jim Fogle and his brother Dennis Fogle**

39.    One of the many tips police received in the first week of the investigation was that a young man named Dennis Fogle, who drove a blue car, had invited a teenage girl to spend the night with him the night after Kathy's body was found.

40.    Based on this tip, police interviewed Dennis Fogle, who told the officers truthfully that he and his brother—Plaintiff Jim Fogle—had been at the home of a man named Art McDonald that evening, and the three of them went to a bar, where they stayed until it closed. State troopers

then interviewed Art McDonald and Jim Fogle, who both corroborated Dennis's account of their whereabouts on the night of July 30.

41.    The troopers searched Dennis Fogle's vehicle—a blue Pontiac Tempest—and found nothing of evidentiary value.

**Earl Elderkin claims to have witnessed Kathy Long's rape and murder**

42.    Over the course of the five-year investigation into Kathy Long's murder, a man named Earl Elderkin—known in the area as "Spaceman," because he claimed that he and his kids were from outer space—emerged as a central figure. Elderkin came within the radar of state troopers in the first week of the investigation when Defendant Sokol received a tip that Elderkin fit the description of the composite image in circulation and was a "shady" character.

43.    With the first anniversary of Kathy Long's death approaching, the investigation had largely stalled when Elderkin gave a statement to Defendant Beckwith claiming, for the first time, that he had witnessed Kathy Long's murder. Prior to this statement, officers had spoken to Elderkin on multiple occasions. Elderkin had denied involvement in the crime, and accounted for his whereabouts for much of the day of Kathy Long's abduction.

44.    Elderkin's new account was bizarre and hazy—he could not provide any times or even estimated times. He claimed to have been "really messed up on that THC and beer," and to only remember pieces.  Despite reportedly drifting in and out of consciousness during the crime, Elderkin claimed to remember being in front of the Long residence, and then being in the back seat of a car with a girl, and at one point thereafter looking through the windshield and seeing a girl running before a man pulled out a rifle from the front seat and shot her.

45.    After Elderkin's statement, he was given a polygraph exam. Upon information and belief, he did not pass the polygraph exam.

46.     Defendants knew that Elderkin's statement was wholly unreliable, and they chose not to follow up on the information Elderkin provided, instead pursuing other leads.

47.     Over the next four years, the police developed fewer and fewer new leads and existing leads grew cold.

**Elderkin checks himself into a psychiatric unit and Defendants determine to use him as a tool to close their investigation**

48.     In February 1981, four-and-a-half years after the crime, the investigation took a dramatic turn when Defendant Officers learned that Elderkin had checked himself into the psychiatric wing of a hospital and asked to speak with police about the Kathy Long murder investigation.

49.     The hospital, located in neighboring Cambria County, contacted an Assistant District Attorney of that county who encouraged Defendant Officers to move forward with the case relying on Elderkin's remarks.

50.     At Defendant Walp's instruction, Defendant Steffee then went to the hospital and took a new statement from Elderkin while at his bedside, in which Elderkin pointed to 16 other men, and another girl, as being present at the scene of Kathy Long's murder. Elderkin's statement was rambling, contradictory, and inconsistent. Elderkin emphasized that he could not remember much, was not sure who drove him to the scene, whether they had raped Kathy Long, or whether his memories were based in reality, or on dreams and nightmares that he had been having.

51.     Two days later, Defendants Steffee and Walp re-interviewed Elderkin at the police barracks. This time, according to a report by Defendant Steffee, Elderkin stated that a man named Joe Recesky had raped and shot Kathy Long, assisted by a man named John Lynch.

52.     Despite his obvious unreliability, Elderkin's new statements reinvigorated the investigation.

**Hypnosis**

53.     Defendants, including Sokol, Steffee, and Walp, knew that Elderkin was an unreliable but highly malleable witness who had already given four different versions of what he did—and who else was involved—on the day of the crime. Sensing an opportunity to close a five-year-old murder investigation, they enlisted an amateur hypnotist to obtain and solidify a statement from Elderkin that, at least superficially, appeared more solid.

54.     Defendants, including Sokol, Steffee, Walp, and District Attorney Gregory Olson, arranged for an English teacher with no formal training in hypnosis to "hypnotize" Elderkin at the Indiana Borough Police Department. At the behest of Defendants, the "hypnotist" used undue suggestion to obtain a statement from Elderkin implicating the four other men Defendants suspected—Joe Recesky, John Lynch, Jim Fogle and Dennis Fogle.

55.     During this "hypnosis" session, approximately three weeks after Elderkin's voluntary psychiatric hospitalization, Elderkin once again changed his story and for the first time implicated Dennis and Jim Fogle as having raped Kathy Long, and Jim Fogle as the man who shot her.

56.     Immediately after the "hypnosis" session, Defendants Walp, Sokol, Steffee, and Olson read Elderkin his *Miranda* rights, and took yet another statement from him. Post-"hypnosis," there were no longer large gaps in Elderkin's memory, the account was no longer hazy, and he expressed little uncertainty about what had occurred.

57.     Although ultimately suppressed before trial, this post-hypnosis statement reflected and further shaped the basis of the prosecution's and police's theory of the case, and ultimately was a cause of Mr. Fogle's arrest, prosecution, conviction, and incarceration.

58.     Elderkin's statement included the following false details about Kathy Long's murder:

a. On the day of Kathy's disappearance, he left Art McDonald's home with Jim and Dennis Fogle after dark, between 8 and 10 p.m, and drove to the Long residence, where three girls, including Kathy Long, came out to talk to them.

b. Kathy Long stood on the driver's side, speaking to Jim Fogle, while another brown-haired teenage girl stood on the passenger's side, speaking to Dennis Fogle.

c. At some point, Kathy Long went into the house, Jim Fogle got out of the car and went to their porch, and Kathy Long then came back out and got into the car, along with Jim.

d. The four of them then drove to a wooded area where Joe Recesky and John Lynch were waiting. Jim Fogle then got into an argument with Kathy Long about her selling drugs without his permission, as John Lynch egged him on.

e. Jim and Dennis Fogle then raped Kathy Long in succession as John Lynch held her down.

f. After she was raped, Kathy then ran to the front of the car and was screaming that she would tell others what they had done. Jim then turned on the headlights, took out a rifle, and fired three shots.

**Defendants Fabricate Statements to Match Elderkin's Post-Hypnosis Statement**

59.    Defendants knew that Elderkin's post-hypnosis statement, like his previous statements, was wholly unreliable, untrustworthy, and entirely false—the product of improper suggestion by the Defendants, along with some combination of mental illness, dreams, imagination, deceit, and/or hypnosis. They also knew it was contradicted by evidence obtained earlier during the investigation.

60.    Rather than continuing to try to solve the case through lawful means, Defendants used improper tactics to obtain false evidence that would eliminate inconsistencies, corroborate Elderkin's statement and help them close the case.

61.    Shortly after the crime, both Kathy's older sister Patty Long, and her friend Patty Lydic, had told police they had arrived at the Long house at approximately 4 p.m., learned from Lola that Kathy had left with a stranger in a blue car, and went out looking for Kathy shortly afterwards.

62.    Defendants knew that this timeline provided by Lola Long, Patty Long, and Patty Lydic (and corroborated by others) contradicted Elderkin's statement. They also knew that another witness had accounted for Elderkin's whereabouts until 6:30 p.m.—therefore Elderkin could not have been at the Long's house picking up Kathy Long prior to 6 p.m. that evening.

63.    The day after taking Elderkin's post-hypnosis statement, Defendants Sokol, Steffee, and Walp brought Patty Long and Patty Lydic into the station and used threats—including threats of arrest—intimidation, suggestion and deception to get them to change their statements to corroborate Elderkin's statement and implicate Mr. Fogle.

64.    As a result, both girls adopted a new, false story, fed to them by Defendants Sokol, Steffee, and Walp, that contradicted their earlier statements but were highly consistent with the timing and details of Elderkin's statement.

65.    Specifically, both girls adopted statements that when they returned to the Long house the afternoon of July 30, 1976, Lola Long did *not* tell them that a man had come to the driveway in his car and left with Kathy. Instead, Kathy Long was at home well into that evening; at some point after dark, three men pulled into their driveway in a car and Kathy went outside to talk to the driver. Patty Long and Patty Lydic went outside as well, and Kathy stood on the driver's side

of the car while Patty Lydic stood on the passenger's side. Eventually, Kathy Long left with them. Two hours later, the car came back and the men inside were laughing and yelled to Patty Long and Patty Lydic that, "you girls are next."

66.     Patty Lydic retracted her statement immediately after giving it. Defendants then tried, unsuccessfully, to enlist her boyfriend to ensure that she would later testify to the false and fabricated story they had elicited from her.

67.     Defendants affirmatively misrepresented in written and oral reports that Patty Long and Patty Lydic had voluntarily changed their statements and otherwise hid their misconduct with respect to the statements of Patty Long and Patty Lydic from defense counsel, the court, and the jury.

68.     At Mr. Fogle's trial, Patty Lydic testified for the defense and acknowledged that she gave a false statement that simply parroted what Defendant Walp told her to say because the police were pressuring her and she wanted to go home.

69.     Patty Long, however, eventually testified consistently with her false and fabricated statement that Kathy did not leave with a man around 4 p.m., but instead left with three men around 9 p.m.

**Defendants arrest Jim and Dennis Fogle and fabricate a "confession" from Dennis Fogle**

70.     The day after fabricating Patty Long's statement to match Elderkin's, Defendant Sokol filed criminal complaints against Jim Fogle, Dennis Fogle, Joe Recesky, and John Lynch, for criminal homicide and complicity to commit murder, on the basis of Elderkin's post-hypnosis statement and the fabricated statement of Patty Long. In the probable cause affidavit they presented to the magistrate judge, neither Defendant Officers nor Defendant Prosecutors reported any of the prior inconsistent statements of Earl Elderkin or the fact that he had made his

statement after undergoing hypnosis, or the past inconsistent statements of Patty Long. Despite

his claimed involvement in the crimes, Elderkin was never charged with any crime in relation to

the rape and murder of Kathy Long.

71.     A district justice accordingly issued warrants for the arrest of Jim and Dennis Fogle,

Lynch, and Recesky, and police arrested all four men the afternoon of March 19, 1981.

72.     Over the next 9 hours, Defendants, including Sokol, Steffee, Beckwith, and Mollura

worked to coerce a confession from Dennis Fogle. As Defendants Sokol, Steffee, and Walp had

done with Patty Long and Patty Lydic, Defendants Sokol, Steffee, Beckwith, and Mollura, acting

in concert, fabricated a falsely inculpatory statement from Dennis Fogle by using threats,

intimidation, and other coercive tactics, and by feeding him non-public details from Elderkin's

statement about the way the crimes supposedly had occurred. After approximately 9 hours of

interrogation, Defendants Beckwith and Mollura obtained a false and fabricated recorded

"confession" in which Dennis implicated himself and Jim Fogle in the rape and murder of Kathy

Long.

73.     The next morning, Defendants Steffee and Sokol, along with Defendant District Attorney

Gregory Olson, used the same improper tactics to obtain another false and fabricated recorded

statement from Dennis Fogle that would more strongly support their theory of the case. As a

result, Dennis Fogle's March 20 statement was significantly more consistent with Elderkin's

statement—and with the false statements from Patty Long and Patty Lydic, as well as ballistics

evidence that the murder weapon was a gun stored in Kathy Long's home—than his statement

from the night before.

74.     Defendants misrepresented in written and oral reports that Dennis Fogle had volunteered

the "confession" and subsequent statement without coercion or suggestion, and otherwise hid

their misconduct with respect to Dennis Fogle's statements from defense counsel, the court, and the jury.

**Defendants Fabricate Statements of Jailhouse Informants Harold Stewart and John Pearce**

75.    Although Defendants, including Sokol, Steffee, Walp, and Olson, attempted to conceal that Elderkin's statement was obtained through hypnosis, and was inconsistent with his prior statements, defense counsel learned about the hypnosis while cross examining Earl Elderkin at a preliminary hearing on March 27, 1981, over the objection of Defendant Prosecutors Olson and Martin.

76.    Knowing their evidence was weak and would likely be further weakened by the defense, Defendants obtained additional support for their case against Jim Fogle by fabricating the testimony of jailhouse informants.

77.    The same day as the preliminary hearing at which Defendants' hypnosis of Elderkin came to light, Defendants Sokol and Steffee took the statements of two known jailhouse informants—Harold Stewart and John Pearce—who were jailed with Mr. Fogle after his arrest. Sokol and Steffee interviewed Stewart and Pearce, and either fed them non-public details about their theory of the crime and falsely reported that Stewart and Pearce had volunteered that those details originated from Jim Fogle as part of a spontaneous confession, or intentionally misrepresented in reports that Jim Fogle had voluntarily given Stewart and Pearce a detailed confession, despite knowing that was false.

78.    Stewart and Pearce's statements falsely claimed that Mr. Fogle had approached them in jail and, without prompting, volunteered a detailed confession to the rape and murder of Kathy Long. Stewart and Pearce's statements contained and incorporated non-public details that were consistent with Elderkin's post-hypnosis statement, and purportedly volunteered to them by Jim

Fogle, including the individuals present at the scene of the crime, the location of the rape in the seat of the car, the fact that the murder weapon—according to ballistics evidence—was a rifle taken from Kathy Long's home, and the drug-related motive for the shooting.

79.     Upon information and belief, in return for these statements inculpating Jim Fogle, Defendants Sokol and Steffee made promises of leniency on Stewart's and Pearce's pending charges.

80.     Defendants, including Sokol and Steffee, then falsely represented in written and oral reports and statements that Stewart and Pearce had volunteered their statements, which included these details allegedly provided to him by Jim Fogle, without any prompting, suggestion, or promises of leniency.

81.     Defendant Prosecutors either knew about, encouraged, or permitted Defendants Sokol and Steffee to fabricate the statements of Pearce and Stewart, or in the alternative, Defendants Sokol and Steffee misled the Defendant Prosecutors to believe that jailhouse informants' statements were not fabricated or otherwise procured through misconduct.

82.     Defendants hid their misconduct with respect to the statements of Stewart and Pearce from defense counsel, the court, and the jury.

**The Court suppresses Elderkin's statement and Dennis Fogle's "confession"**

83.     Upon learning that Elderkin's statement had been obtained after hypnosis, Mr. Fogle, Dennis Fogle, Joe Recesky, and John Lynch, through their attorneys, moved to suppress all testimony by Earl Elderkin on the basis that the improperly-conducted hypnosis session irreparably altered Elderkin's memory such that it was impossible to determine what memory, if any, he had of the incident prior to being hypnotized. On July 14, 1981, the court granted these motions and precluded Elderkin from testifying at trial.

84.    The court also granted Dennis Fogle's motion to suppress his "confession," on the grounds that the statement was taken pursuant to an illegal arrest, because the probable cause affidavit sworn out by Defendant Sokol and used to obtain warrants for the arrests of Dennis and Jim Fogle, Joe Recesky, and John Lynch, contained misleading information. Specifically the probable cause affidavit referred to Elderkin's statement but failed to mention that it was obtained after hypnosis, that it contradicted Elderkin's prior statements to police, or that he was a patient in a psychiatric ward when he reached out to the police to offer a statement. The court further noted that Sokol's affidavit indicated that Patty Long's statement corroborated Elderkin's account, but failed to mention it was inconsistent with all of her prior statements.

**Defendants fabricate statement of jailhouse informant Edward Klingensmith**

85.    Despite this ruling recognizing the unreliability of evidence implicating Jim Fogle, and Defendants' knowledge that the only other evidence tying Jim Fogle to the crimes—statements from Harold Stewart and John Pearce—was also false and fabricated, Defendants remained determined to prosecute Jim Fogle.

86.    The day after the state court suppressed the use of Elderkin's testimony at trial and the use of Dennis Fogle's confession in a trial against him, Defendants fabricated the statement of another recidivist jailhouse snitch, Edward Klingensmith, from whom Defendants had obtained statements relative to other unsolved homicides.

87.    Defendants Steffee and Stephen interviewed Klingensmith, and fed him non-public details consistent with Stewart's and Pearce's accounts and consistent with Defendants' pet theory of how the crime occurred. They then drafted a false and misleading report stating that Klingensmith had reported obtaining a detailed confession from Mr. Fogle—his fellow inmate—that contained those details.

88.    Upon information and belief, Defendant Sokol, as the prosecuting officer and Steffee's partner, was either aware of or participated in feeding these non-public details to Klingensmith and fabricating his statement.

89.    The fed details attributed to Jim Fogle in Klingensmith's statement included without limitation:

a.    That Kathy Long had been shot with a .22 caliber rifle taken from the Long family's home;

b.    That Jim Fogle, Dennis Fogle and Earl Elderkin had picked up Kathy Long at her house and met Joe Recesky and John Lynch at the scene;

c.    That Jim Fogle shot at Kathy twice, hitting her once;

d.    That before she was shot Kathy Long threatened to report that she had been raped;

e.    That the crimes were retaliation for a drug debt owed by Kathy Long.

90.    Defendant Prosecutors either knew about, encouraged, or permitted Defendants, including Steffee, Sokol, and Stephen to fabricate the statement by Klingensmith, or in the alternative, Defendants, including Steffee, Sokol and Stephen misled the Defendant Prosecutors to believe that Klingensmith's statement was not fabricated or otherwise procured through misconduct.

91.    Upon information and belief, in return for this statement inculpating Jim Fogle, Defendants made promises of leniency on Klingensmith's pending charges.

92.    Defendants, including Sokol, Steffee, and Stephen, then falsely represented in written reports and oral statements that Mr. Klingensmith had volunteered his statement, which included these facts allegedly provided to him by Jim Fogle, without any prompting, suggestion, or

promises of leniency. Defendants hid their misconduct with respect to Klingensmith's statement from defense counsel, the court, and the jury.

**Prosecutors drop charges against Dennis Fogle, John Lynch, and Joseph Recesky**

93.     Because they were precluded from using any testimony by Elderkin or Dennis Fogle's "confession," and had no independent evidence to corroborate Elderkin's statement implicating Dennis Fogle, John Lynch, and Joe Recesky within the time limits prescribed in Pennsylvania for bringing a criminal case to trial, the Commonwealth moved for entry of *nolle prosequi* in its cases against Dennis Fogle, Lynch, and Recesky.

**Jim Fogle's Trial**

94.     On the basis of fabricated statements from jailhouse informants falsely claiming Jim Fogle had implicated himself in the rape and murder of Kathy Long, and the false and fabricated statement of Patty Long corroborating the details and timing of Elderkin's statement, the Commonwealth went forward with its trial of Mr. Fogle for the murder of Kathy Long.

95.     Jim Fogle's trial began on February 22, 1982—the last day on which the Commonwealth could hold a trial without violating Pennsylvania's speedy-trial rules—and lasted for 5 days.

96.     Patty Long and the three jailhouse informants—Stewart, Pearce, and Klingensmith— were key witnesses for the Commonwealth's case.

97.     Patty Long testified falsely and consistent with her fabricated statement—which tracked Elderkin's post-hypnosis statement—that Kathy was home for dinner on July 30, 1976, and left in a car with three men around 9 p.m. Patty Long did not identify Jim Fogle as one of the men in the car, and her description of the driver did not match Jim Fogle. When asked by the prosecution why she gave a different story to PSP investigators early on in the investigation, she replied that she was scared of the police.

98.     The informants all testified falsely and consistent with their fabricated statements that Jim Fogle had volunteered a detailed confession to them while in jail, and that no promises or deals were made in return for their testimony.

99.     The defense's key witnesses were Lola Long and Patty Lydic, both of whom testified consistently with their statements in the early days of the murder investigation, which undermined the prosecution's timeline.

100.    Lola testified that Kathy was picked up by a man who had come to the house in daylight before Patty Long and Patty Lydic had returned from the store.

101.    Patty Lydic testified that when she and Patty Long reached the Long residence from the store around 4:30 p.m., Kathy was not home and Lola told them she had left with some men. She further testified that her contradictory March 17, 1981 statement to police, which tracked the prosecution's theory of the case, was a lie given under pressure by the police, who had threatened to arrest her if she did not tell them what they wanted to hear.

102.    The defense also called multiple alibi witnesses who provided Mr. Fogle with an alibi until between 7 and 7:30 p.m on July 30, 1976.

103.    Jim Fogle testified in his own defense, gave his account of July 30, 1976—which was consistent with his statement to police in the early stages of the investigation—and adamantly denied any involvement in the rape and murder of Kathy Long.

104.    The jury found Mr. Fogle guilty of second degree murder on February 26, 1982, and Mr. Fogle was sentenced to life imprisonment without the possibility of parole.

**Jim Fogle's Exoneration**

105.    Jim Fogle consistently maintained his innocence from the moment he learned he was a suspect in the Kathy Long murder investigation. He steadfastly and diligently fought to prove his innocence throughout his trial and after his wrongful conviction.

106.    In the first two decades after his wrongful conviction, Mr. Fogle filed numerous *pro se* requests for new trial, habeas corpus relief, or relief under the Pennsylvania Post-Conviction Relief Act, which were denied in 1989, 1991, 1993, 1994, 1997, and 2002.

107.    In 2003, Mr. Fogle filed a motion for post-conviction DNA testing, which was denied.

108.    In 2009, the Innocence Project agreed to take on his case. On July 7, 2014, the Innocence Project requested evidence from the Indiana County Pennsylvania State Police Barracks with the hope that evidence that had previously been designated as lost would be found. In response to this request, twelve additional items of evidence from the crime scene were found and subsequently produced to the Innocence Project; among these items were the victim's pubic hair combings.

109.    On August 18, 2014, the Indiana County District Attorney's Office and Mr. Fogle entered into a second stipulated Order for Post-Conviction DNA Testing.

110.    In March 2015, Orchid Cellmark, a renowned DNA laboratory with a history of working with prosecutors, identified sperm during a visual examination of the victim's pubic hair combings. Orchid Cellmark conducted Y-STR testing on the victim's pubic hair combings. Y-STR testing identifies only male contributors because it examines only the Y chromosome, which only men have.

111.   Results of that testing revealed a partial male profile. The partial Y-STR profile was compared to a DNA sample from Mr. Fogle, who was excluded as being the source of the DNA obtained from the sperm deposited on the victim's pubic hair combings.

112.   Because Dennis Fogle is a full biological brother of Mr. Fogle, they share the same Y-chromosome from their father, and thus the Y-STR profile that excluded Mr. Fogle also necessarily excluded Dennis Fogle as the source.

113.   On June 24, 2015, Mr. Fogle moved to vacate his conviction on the basis of actual innocence.

114.   On August 13, 2015, Indiana District Attorney Patrick Dougherty joined Mr. Fogle's motion, and Judge David E. Grine vacated Mr. Fogle's conviction and granted him a new trial.

115.   That same day, after having spent nearly 35 years in prison for a crime he did not commit, Mr. Fogle was released from prison on bail pending trial or dismissal of charges.

116.   On September 14, 2015, DA Dougherty formally dropped all charges against Mr. Fogle, citing that the original case against him was without "prosecutorial merit." Judge Grine subsequently dismissed the case with prejudice, granting a motion filed on Mr. Fogle's behalf by the Innocence Project.

**Indiana County had a policy, practice or custom of misconduct in homicide investigations**

117.   Defendant County of Indiana, by through its final policymaker District Attorney Gregory Olson, had in force and effect during the Kathy Long murder investigation a policy, practice, or custom of unconstitutional misconduct in homicide investigations, including in particular the encouragement and use of, and reliance on, improper interrogation and interview techniques to obtain false and inculpatory witness statements, including hypnosis and providing non-public information to witnesses in order to import credibility into extracted statements and confessions;

the encouragement and use of, and reliance on, plainly unreliable informants and/or witness statements that law enforcement knew or should have known were false; the fabrication of inculpatory evidence; the suppression of exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes. The investigation of Mr. Fogle was conducted pursuant to each of these customs of misconduct.

## **DAMAGES**

118.   Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Jim Fogle to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 34 years, 4 months, and 25 days—greater than half his life—imprisoned and separated from his wife and his two young sons.

119.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Fogle sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than thirty-four years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

120.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or

deliberately indifferent acts and omissions, Mr. Fogle was also deprived of his familial relationships, including relationships with his children.

121.   As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Fogle sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, inadequate medical care, for which he is entitled to monetary relief.

122.   Mr. Fogle continues to suffer physical, emotional, mental, and psychological damage as a result of the Defendants' conduct.

123.   These injuries and damages to Mr. Fogle were foreseeable to Defendants at the time of their acts and omissions.

124.   All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against Defendant Officers and Defendant Prosecutors*

125.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

126.   Defendants, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Mr. Fogle for Ms. Long's rape and murder, intentionally caused Mr. Fogle to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Fogle's clearly established right, under the Fourth and Fourteenth Amendments to the U.S. Constitution, to be free of prosecution absent probable cause.

127.   Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

128.   Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Fogle's clearly established constitutional rights. No reasonable officer in 1981 would have believed this conduct was lawful.

129.   The prosecution finally terminated in Mr. Fogle's favor on September 14, 2015, when the Indiana County District Attorney's office formally dropped all charges against Mr. Fogle.

130.   The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Fogle's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Fogle.

**COUNT II: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial in Violation of the Fourteenth Amendment through Fabrication of Evidence and Withholding of Material Exculpatory and Impeachment Evidence**

*Against Defendant Officers and Defendant Prosecutors*

131.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

132.   Defendants, acting individually and in concert, and within the scope of their employment with the PSP, deprived Mr. Fogle of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or undue suggestion to obtain inculpatory witness statements, including without limitation: the false statements of Earl Elderkin, Dennis Fogle, Patty Long, John Pearce, Harold Stewart, and Edward Klingensmith. Defendants then concealed the misconduct that had produced those

statements as well as additional material exculpatory and impeachment evidence, including but not limited to coercive and suggestive tactics used in witness interviews.

133.   Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Fogle's clearly established constitutional rights. No reasonable officer in 1981 would believe this conduct was lawful.

134.   The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Fogle's injuries. These Defendants knew, or should have known, that their conduct would result in Mr. Fogle's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III: 42 U.S.C. § 1983 Civil Rights Conspiracy

### *Against Defendant Officers and Prosecutors*

135.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

136.   The Defendant Officers and District Attorneys, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive Mr. Fogle of his clearly established Fourth and Fourteenth Amendment rights to be free from malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

137.   In furtherance of the conspiracy, the Defendant Officers and Prosecutors engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.   Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

    b.   Withholding material exculpatory evidence from defense counsel, the court, and the jury;

    c.   Wrongfully prosecuting Mr. Fogle while knowing that they lacked probable cause; and

    d.   Committing perjury during hearings and trials.

138.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Fogle's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Fogle's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT IV: 42 U.S.C. § 1983 Failure to Intervene**

*Against Defendant Officers and Defendant Prosecutors*

139.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

140.   By their conduct and under color of state law, the Defendant Officers and Defendant Prosecutors, acting within the scope of their employment with the PSP and Indiana County, respectively, had opportunities to intervene on behalf of Mr. Fogle to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

141.   These Defendants' failures to intervene violated Mr. Fogle's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police officer or prosecutor at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence or causing Mr. Fogle to be arrested and prosecuted without probable cause, were lawful.

142.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Fogle's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Fogle's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V: 42 U.S.C. § 1983 Supervisory Liability Claim

### *Against Defendants Walp, Mollura, and Bardroff*

143.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

144.    The defendant PSP officers, Sokol, Steffee, Beckwith, and Stephen, acted with impunity in an environment in which they were not adequately supervised, disciplined, or trained by Defendants Walp, Mollura, and Bardroff, in this case and as a matter of practice.

145.    Defendants Walp, Mollura, and Bardroff acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the Defendant Officers, and thereby caused the individual Defendant Officers to deprive Jim Fogle of his clearly established constitutional rights, including his rights to be free from false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and his right to a fair trial.

146.    Had Defendants Walp, Mollura, and Bardroff not provided grossly inadequate training, supervision, and discipline of the Defendant Officers, they would not have fabricated inculpatory evidence, committed perjury, and intentionally and maliciously caused Jim Fogle to be arrested and prosecuted without probable cause.  Defendants Walp, Mollura, and Bardroff were directly involved in the investigation of Jim Fogle and directly supervised the specific investigative acts taken by the PSP officer defendants in this case.

147.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants

Walp, Mollura, and Bardroff under color of state law violated their clearly established duty, in 1981, to supervise Defendants Sokol, Steffee, Beckwith, and Stephen, and no reasonable police supervisor in 1981 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

148.   As a direct and proximate result of Defendants' actions, Jim Fogle was wrongly convicted and imprisoned for more than thirty-four years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT VI: 42 U.S.C. § 1983 *Monell* Claim

*Against Defendant County of Indiana*

149.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

150.   Defendant County of Indiana was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Indiana County District Attorney's Office.

151.   Defendant County of Indiana had a policy, practice, or custom of unconstitutional misconduct in homicide investigations, including in particular the encouragement and use of, and reliance on, improper interrogation and interview techniques to obtain false and inculpatory witness statements, including hypnosis and providing non-public information to witnesses in order to import credibility into extracted statements and confessions; the encouragement and use of, and reliance on, plainly unreliable informants and/or witness statements that law enforcement knew or should have known were false; the fabrication of inculpatory evidence; the suppression of exculpatory and/or impeachment evidence; ignoring evidence that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes.

152.    Defendant County of Indiana and its District Attorney's Office's final policymaker, Defendant Olson, decided to undertake and participate in improper interrogation and interview techniques, including in interviews of Earl Elderkin and Dennis Fogle, as well as the withholding and suppression of material exculpatory evidence from the defense. Defendant Olson's decisions as final policymaker demonstrate Indiana County's custom, pattern, practice, or policy of unconstitutional misconduct in homicide investigations.

153.    Defendant Olson, as Indiana County and the Indiana County District Attorney's Office's final policymaker, also ratified the unconstitutional decisions and actions of Defendant Martin as described above.

## STATE LAW CAUSES OF ACTION

### COUNT VII: Malicious Prosecution under Pennsylvania state law

*Against Defendant Officers and Prosecutors*

154.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

155.    The Defendant Prosecutors and Officers initiated or continued proceedings against Mr. Fogle without probable cause, with malice, and the proceedings ultimately terminated in Mr. Fogle's favor on September 14, 2015, when the Indiana County District Attorney's office formally dropped all charges against Mr. Fogle.

156.    As a direct and proximate result of this malicious prosecution, Mr. Fogle sustained the injuries set forth above.

### COUNT VIII: Respondeat Superior Liability

*Against Defendant County of Indiana*

157.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

158.    The Defendant Prosecutors were at all times material to this complaint employees of the Indiana County District Attorney's Office, and acted within the scope of their employment in committing the misconduct described above.

159.    Defendant County of Indiana is liable as principal for all intentional torts committed by its agents.

**WHEREFORE**, Plaintiff Jim Fogle prays as follows:

A.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §1983 claims; and

E.  For any and all other relief to which Plaintiff may be entitled.


                                        */s/        Thomas J. Farrell*
                                        Thomas J. Farrell
                                        Pa. ID No. 48976
                                        Emily M. McNally
                                        Pa. ID No. 206591
                                        Farrell & Reisinger, LLC
                                        300 Koppers Building
                                        436 Seventh Avenue
                                        Pittsburgh, PA 15219
                                        (412) 894-1380

                                        Peter Neufeld*
                                        Emma Freudenberger*
                                        Vishal Agraharkar*

Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081
*Attorneys not yet admitted to the Western
District of Pennsylvania; applications to
practice* pro hac vice *forthcoming*