IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LEWIS JAMES FOGLE**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:17cv194 |
| ) | **Electronic Filing** |
| **Pennsylvania State Police Troopers** ) | |
| **JOHN SOKOL, MICHAEL STEFFEE** ) | |
| **DONALD BECKWITH and JOSEPH** ) | |
| **STEPHEN, Corporals JOHN** ) | |
| **BARDROFF and ANDREW** ) | |
| **MOLLURA, and Lieutenant GLENN** ) | |
| **WALP, in their individual capacities**; ) | |
| **COUNTY OF INDIANA,** ) | |
| **PENNSYLVANIA**; **Indiana County** ) | |
| **District Attorney GREGORY OLSON,** ) | |
| **in his official and individual capacity**; and ) | |
| **Indiana County Assistant District** ) | |
| **Attorney WILLIAM MARTIN, in his** ) | |
| **individual capacity,** ) | |
| ) | |
| Defendants. ) | |

## <u>OPINION</u>

Lewis James Fogle ("Plaintiff") commenced this civil rights action seeking redress for his

wrongful conviction.  Plaintiff spent 33 years in prison.  His conviction recently was vacated

after he was exonerated through post-conviction DNA evidence.  Named as defendants are the

County of Indiana, Pennsylvania; former Indiana prosecutors Gregory Olson and William Martin

("Defendant Prosecutors"); and Pennsylvania State Police ("PSP") officers John Sokol, Michael

Steffee, Donald Beckwith, Joseph Stephen, John Bardroff, Andrew Mollura, and Glenn Walp

(hereinafter "Defendant Officers").[1]  Presently before the court is Defendant Prosecutors and

---

[1]  The individual defendants held these positions in 1976.

Defendant County of Indiana's motion to dismiss. For the reasons set forth below, the motion will be granted in part and denied in part.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Phila., 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "'a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In contrast, pleading facts that only offer "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are "'merely consistent with' a defendant's liability." Id. (quoting Twombly, 550 U.S. at 555, 557). Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 678 (internal citation and quotation omitted); see also Twombly, 550 U.S. at 563 n.8 (A complaint states a claim

where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)); accord Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (a court need not credit "bald assertions" or "legal conclusions" in assessing a motion to dismiss) (citing with approval Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed. 1997) ("courts, when examining 12(b)(6) motions, have rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations'").

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("'The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully'"); Phillips v. Cty. of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element . . . [and provides] 'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556); see also Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("'The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element'") (quoting Phillips, 515 F.3d at 235) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

The averments of the complaint construed in the light most favorable to Plaintiff establish the background set forth below. This case emanates from the rape and murder of Kathy Long, which occurred sometime between July 30 and July 31, 1976. Kathy Long was last seen alive at her house around 4:00 p.m. on July 30, 1976. Three of Kathy's sisters and a friend all indicated during initial police interviews that a man in a blue car pulled into the driveway. Kathy walked up to the car and began conversing with him. She then got into his car and left. Sisters Lola and Rose described the man as being between twenty and thirty years of age and having blue eyes, sideburns, heavy eyebrows, a heavy mustache over his upper lip, and black hair that hung below his ears and curled at the ends. In 1976, Plaintiff had straight reddish-blonde hair that dropped down his back and a matching full beard that reached his waist.

One of the many pieces of information the police received during the investigation was that a young man named Dennis Fogle (Plaintiff's brother) drove a blue car and had invited a teenage girl to spend the night after Kathy's body was found. The police interviewed Dennis Fogle. He explained that he and Plaintiff had been at Art McDonald's house the night of the murder. They then went to a bar and stayed there until it closed. Police searched Dennis Fogle's car and did not find anything.

Within a week after the murder a man named Earl Elderkin came to light. Elderkin was known in the area as "spaceman" because he told everyone that he and his children were from outer space. Elderkin fit the description of the unknown man in the blue car and the composite sketch that had been drawn from the sisters' initial reports. The investigators were told that Elderkin was a "shady" character.

With the first anniversary of Kathy's death approaching, Elderkin gave a statement to Officer Beckwith claiming that he had witnessed Kathy's murder. Prior to this statement, the

police had spoken with Elderkin on multiple occasions.  On each of these he had denied any involvement in the crime and had accounted for his whereabouts on the day in question.  Now, explaining that he was really messed up from THC and beer and was drifting in and out of consciousness during the crime, Elderkin stated that he remembered being in the back seat of a car stationed in front of the Long residence. [2]  He also remembered seeing a girl running before a man pulled out a rifle and shot her.  Elderkin's new account was hazy and bizarre and he was unable to provide any timelines or other details   After Elderkin's statement he was given a polygraph exam, which he failed.

The officer defendants knew Elderkin's changed statement was wholly unreliable and chose not to pursue it further.  They continued to focus on other leads.  Over the next four years the sources of new information diminished and the old leads grew cold.

In February of 1981, four-and-a-half years after the crime, Elderkin checked himself into the psychiatric wing of a hospital and asked to speak with police about Kathy's murder.  In yet another statement, Elderkin indicated sixteen men and one girl were present at the scene of the

---

[2]  Elderkin likely was referring to Phencyclidine, commonly known as PCP, which was classified as both a hallucinogen and as an anesthetic.  It was developed in the 1950s and used as an animal tranquillizer.  Illicit use became widespread in the 1960s and 1970s.

  For legal purposes, the U.S. Drug Enforcement Administration considers PCP a hallucinogen, meaning it can make people see, hear, feel, and otherwise sense things that are not real. Scientists classify it as a dissociative anesthetic. Dissociative refers to a feeling of being disconnected from one's body.  An anesthetic is a substance that causes a loss of sensation in the body.  Depending on the dosage, PCP also acts as a depressant or as a stimulant, slowing down or speeding up normal body functions.  PCP can do all of these things, and in addition, it can have many other weird, unpredictable, and dangerous side effects.

  In the 1970s, PCP was frequently sold as delta-9-tetrahydrocannabinol (THC), which is the active ingredient in marijuana.  Genuine THC was (and is) almost impossible to buy on the street, so almost anything called THC in 1976 was likely to be PCP instead.  See generally https://www.encyclopedia.com/medicine/encyclopedias-almanacs-transcripts-and-maps/pcp-phencyclidine.

murder. Two days later Elderkin stated that Joe Recesky raped and shot Kathy with John Lynch's assistance.

At this juncture Defendant Officers knew that Elderkin was both unreliable and highly subject to manipulation. He had given no fewer than four different versions of what he and others had done on the day of the murder.

Officers Sokol, Steffee and Walp and District Attorney Olson ("DA Olson") decided to use hypnosis to gain a more coherent and solidified statement from him. They then arranged for an English teacher with no formal training in hypnosis to hypnotize Elderkin. The session was conducted at the Indiana Borough Police Department. At the behest of these defendants, the "hypnotist" used undue suggestion to obtain a statement from Elderkin that implicated the four men these defendants suspected: Joe Recesky, John Lynch, Plaintiff, and Dennis Fogle. During the "hypnosis" session Elderkin again changed his story and for the first time implicated Dennis Fogle and Plaintiff. This time Elderkin stated that both had raped Kathy and Plaintiff was the man who shot her.

After the session Elderkin was Mirandized and gave another statement to the same effect. This time his statement was coherent, concise and certain about what had occurred. All of the gaps and haziness of the prior statements had disappeared.

Although obtained under circumstances that rendered the information unreliable and wholly lacking in probable cause, the post-hypnosis statement ("Elderkin's new statement") shaped the basis of the prosecution and police's theory of the case going forward. Officers Sokol, Steffee and Walp and DA Olson knew that Elderkin's statement was unreliable, untrustworthy, and false. They likewise had reason to believe it was the product of improper

suggestion and mental illness. And it contradicted all earlier reliable evidence. They decided to proceed with it anyway and began to search for ways to corroborate it.

At this juncture Officers Sokol, Steffee and Walp and DA Olson knew that the timelines in the statements given shortly after the murder by Kathy's older sister, Patty Long, and her friend, Patty Lydic, contradicted and thus undermined Elderkin's new statement.

At Officers Sokol, Steffee and Walp's insistence, two witnesses, Patty Lydic and Patty Long, changed their stories to reflect the timing and details of Elderkin's new statement. Officers Sokol, Steffee and Walp brought Patty Long and Patty Lydic to the police station and used threats, intimidation, suggestion and deception to convince them to change their accounts, corroborate Elderkin's new statement and implicate Plaintiff. The young women eventually broke down and gave new statements. Their new statements contradicted their earlier ones and followed the timing and details of Elderkin's new statement.

Patty Lydic retracted her new statement directly after she was released. Defendants tried to enlist her boyfriend to help ensure that she would testify to the new, "helpful" statement. They were unsuccessful. Defendants ignored Patty Lydic's retraction and repeatedly represented in written and oral reports that both women had voluntarily changed their statements. The manner in which the statements were obtained was not disclosed to the defense, the court or the jury.

At Plaintiff's trial, Patty Lydic testified for Plaintiff. During her testimony she acknowledged that she gave a new statement and explained that it simply parroted what Defendant Walp wanted her to say. She did this because she was under police pressure and just wanted to go home.

Patty Long, however, testified consistently with her statement given under police pressure. She testified that Kathy had left their home with three men around 9:00 p.m., instead of 4:00 p.m., which she initially had told the officers.

The day after coercing Patty Long into giving a statement to match Elderkin's new statement, Officer Sokol filed criminal complaints against Plaintiff, Dennis Fogle, Recesky, and Lynch for criminal homicide and complicity to commit murder. In the probable cause affidavit, the Defendant Officers did not mention any of Elderkin's prior inconsistent statements, report that Elderkin made his statement after undergoing hypnosis, or mention any of the past inconsistent statements of Patty Long. DA Olson and Assistant District Attorney Martin ("ADA Martin") did not attempt to correct or change these misleading aspects of the affidavit. A district justice (now known as a magisterial district judge) issued warrants for the arrest of Plaintiff, Dennis Fogle, Lynch, and Recesky. The police arrested all four men in the afternoon on March 19, 1981. Despite his claimed involvement, Elderkin never was charged with any crime.

In the nine hours following the arrests, Officers Sokol, Steffee, Beckwith and Mollura used threats, intimidation and coercive tactics and fed Dennis Fogle non-public details from Elderkin's new statement about the way the crime supposedly had occurred. The end result was a coerced confession from Dennis Fogle that implicated himself and Plaintiff. The next morning, Officers Steffee and Sokol and DA Olson used the same improper tactics to obtain a recorded statement from Dennis Fogle that was false and fabricated and more strongly supported Elderkin's new statement and their construction of the case. The tactics by which this recorded statement was obtained were not revealed during the subsequent development of the case.

At the preliminary hearing defense counsel learned during cross-examination of Elderkin and over the objection of DA Olson and ADA Martin that Elderkin's new statement was

obtained through hypnosis.  Counsel for all defendants then moved to suppress the testimony of Elderkin.

Knowing that all of the evidence generated from Elderkin's new statement was undermined, Defendants sought to generate additional evidence against Plaintiff.  In furtherance of this goal Officers Sokol and Steffee took the statements of two known jailhouse informants – Harold Stewart and John Pearce – who were jailed with Plaintiff after his arrest.  Officers Sokol and Steffee gave Stewart and Pearce non-public details about the crime and thereafter falsely reported that Plaintiff voluntarily had confessed these details to the jailhouse informants.

Stewart and Pearce were given assurances of leniency for giving the statements.  Officers Sokol and Steffee thereafter falsely represented in written and oral reports that the jailhouse informants had volunteered their statements without any prompting, suggestion or promises of leniency.  The officers' misconduct was not disclosed to the defense, the court or the jury.  DA Olson and ADA Martin knew that Officers Sokol and Steffee obtained the statements of Pearce and Stewart through these means.

The trial court prohibited Elderkin from testifying and suppressed Dennis Fogle's confession.  Among other reasons, Dennis Fogle's confession was suppressed because the affidavit contained misleading information in that it failed to mention the four prior inconsistent statements given by Elderkin, that he was in a psychiatric unit when he most recently had reached out to the police, and that Elderkin's new statement was obtained through hypnosis.  It also failed to disclose all of Patty Long's prior inconsistent statements.

Immediately after the adverse ruling, Officers Steffee and Stephen sought and obtained the statement of Edward Klingensmith, another recidivist jailhouse informant.  He previously had given statements in other unsolved homicides.  Officers Steffee and Stephen fed him non-

public information from Elderkin's new statement and falsely represented in written reports and oral statements that Klingensmith had obtained a detailed confession from Plaintiff. Defendant Prosecutors knew about, encouraged and permitted these officers to obtain Klingensmith's statement through these means. Klingensmith was given assurances of leniency. The manner in which the statement was obtained and the promises of leniency were not disclosed to the defense, the court or the jury.

On the basis of the generated statements from the three jailhouse informants and the inconsistent statement of Patty Long, the Commonwealth moved forward against Plaintiff for the murder of Kathy Long. Patty Long and the jailhouse informants testified consistently with their statements that tracked Elderkin's new statement. Although corroborating the timeline that placed Kathy leaving around 9:00 p.m. with three men, Patty Long did not identify Plaintiff as one of these men. Despite exculpatory testimony from defense witnesses, Plaintiff was found guilty of second degree murder on February 26, 1982, and was sentenced to life imprisonment without the possibility of parole.

Plaintiff consistently maintained his innocence and sought post-conviction relief on numerous occasions. These efforts fell short for the first twenty-seven years. In 2009, the Innocence Project agreed to take Plaintiff's case. In 2014, Plaintiff was able to obtain evidence from the original crime scene that previously was thought to be lost or destroyed.

On June 24, 2015, Plaintiff moved to vacate his conviction based on exculpatory DNA evidence, and he was granted a new trial on August 13, 2015. On September 14, 2015, a new Indiana County District Attorney declined to pursue charges against Plaintiff, explaining that the original case was without "prosecutorial merit." Judge Grine of the Indiana County Court of Common Pleas dismissed the case with prejudice.

Based on the above, Plaintiff advances the following 42 U.S.C. § 1983 claims against Defendant Officers and Defendant Prosecutors: (1) malicious prosecution in violation of the Fourth and Fourteenth Amendments; (2) deprivation of liberty without due process of law and denial of a fair trial in violation of the Fourteenth Amendment; (3) civil rights conspiracy; and (4) failure to intervene. He also seeks to maintain (5) a claim for supervisory liability against Officers Walp, Mollura and Bardroff; and (6) a Monell claim against Defendant County of Indiana. He makes the following Pennsylvania state law claims as well: (7) malicious prosecution against Defendant Officers and Defendant Prosecutors and (8) *respondeat superior* liability against Defendant County of Indiana.

Plaintiff further alleges the following policy existed during the murder investigation: the County of Indiana, by and through its final policymaker, DA Olson, had in force and effect a policy, practice or custom of unconstitutional misconduct in homicide investigations. Part of this policy or practice included the encouragement and use of improper interrogation and interview techniques to obtain false and inculpatory witness statements. Among other things, this misconduct included hypnosis and providing non-public information to witnesses in order to inject credibility into their statements and confessions; the encouragement and use of plainly unreliable information or witness statements that law enforcement knew or should have known were false; the fabrication of inculpatory evidence; the suppression of exculpatory or impeachment evidence; ignoring evidence that suggested the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations.

Defendant Prosecutors and the County of Indiana attack plaintiff's complaint on a number of fronts. They assert his federal malicious prosecution, civil rights conspiracy and due process claims are barred by absolute prosecutorial immunity. In addition, the complaint

purportedly contains insufficient factual grounds to support the due process claim because the false testimony did not lead to plaintiff's conviction given that Elderkin and Dennis Fogle's testimony was suppressed and Lydic testified that she had given a false statement to police at their encouragement.[3]  Beyond these bases, Defendant Prosecutors deny they had a duty to intervene in the wrongdoing of a police officer and even if there were such a duty, they posit that there was not enough time to intervene in or otherwise correct any asserted police misconduct.  Finally, defendant Prosecutors argue that Plaintiff's state malicious prosecution claim fails because of high public official immunity.[4]

Defendant County of Indiana contends that Plaintiff's Monell claim fails because DA Olson's asserted actions were taken in the course of his prosecutorial duties and, as a result, they were taken on behalf of the Commonwealth and not the county.  Further, Plaintiff's Monell claim supposedly is improper because the official capacity claim against DA Olson is duplicative of the Monell claim.  As a result, the Monell claim and Indiana County should be dismissed from the lawsuit.  Finally, the County of Indiana insists that Plaintiff's state law claim for *respondeat superior* liability must be dismissed because it is not a stand-alone cause of action and malicious prosecution is an intentional tort for which Indiana County enjoys immunity.

Plaintiff withdraws both his federal and state malicious prosecution claims against Defendant Prosecutors.  He nevertheless argues that the prosecutors are not entitled to absolute immunity for the false statements obtained from Elderkin and Patty Long because they were

---

[3] Defendant Prosecutors also argue that qualified immunity applies to the events at the preliminary hearing.  Plaintiff does not pursue a due process violation regarding any misrepresentations by DA Olson or ADA Martin at the preliminary hearing.

[4] Defendant Prosecutors also argue that plaintiff's claim for failure to intervene is barred by the doctrine of absolute immunity to the extent Plaintiff is arguing that they should have rejected the criminal charges presented by the police.  Plaintiff does not pursue this claim.

involved in their acquisition during the course of the investigation. Additionally, the post-complaint statements of Dennis Fogle and the jailhouse informants were part of the investigative efforts to build a case against the suspects and the Defendant Prosecutors knew they did not have probable cause for any of the arrests. Because investigative activity by a prosecutor is not entitled to absolute immunity, from plaintiff's perspective the conspiracy to engage in the underlying conduct here likewise is not entitled to immunity.

Plaintiff further maintains that the Defendant Prosecutors' fabrication of evidence caused plaintiff's conviction because, even though Elderkin's new statement was suppressed, it knowingly was the basis for the prosecution's theory of the case. And but for Plaintiff being in jail due to the fabricated statements and the fruits gained therefrom, the prosecution would not have been able to generate the false statements from the jailhouse informants. Plaintiff similarly asserts that Defendant Prosecutors were able to intervene because they personally were involved in the investigation. Finally, Plaintiff posits that DA Olson was a final policymaker for Indiana County because he was acting in his investigatory capacity at the time the purported violations occurred and there was no further review of his actions undertaken in this capacity.

Plaintiff's federal claims are brought pursuant to § 1983. In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right.[5] Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by

_____

[5] Section 1983 creates liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

a person acting under color of state law.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996);

accord Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of

Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person

acting under color of law deprived him of a federal right.") (citing Groman, 47 F.3d at 633).

Fourteenth Amendment Violations

*Prima Facie Case*

Plaintiff's complaint sets forth a plausible showing that the moving defendants fabricated

evidence which was used in violation of his right to due process.  The Due Process Clause of the

Fourteenth Amendment prohibits the states from depriving any person of life, liberty, or property

without due process of law.  U.S. CONST. amend. XIV, § 1.  "[A] criminal defendant has been

denied due process of law if he is convicted on the basis of fabricated evidence."  Halsey v.

Pfeiffer, 750 F.3d 273, 289-90 (3d Cir. 2014).  And "the Constitution forbids prosecutors from

knowingly using perjured testimony to secure a criminal conviction."  Id. at 295-96.  This is

because "[f]abricated evidence is an affront to due process of law, and state actors seeking to

frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-

seeking function of the trial process.'"  Black v. Montgomery Cnty, 835 F.3d 358, 370 (3d Cir.

2016) (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)).  Nevertheless, caution must be

used in assessing the nature of the evidence advanced to support a claim of fabrication because

"testimony that is incorrect or simply disputed should not be treated as fabricated merely because

it turns out to have been wrong."  Halsey, 750 F.3d at 295.

> Where
>
> a defendant has been convicted at a trial at which the prosecution has used
> fabricated evidence, the defendant has a stand-alone claim under section 1983
> based on the Fourteenth Amendment if there is a reasonable likelihood that,
> without the use of that evidence, the defendant would not have been convicted.

14

Id. at 294 (emphasis added).  This "reasonable likelihood" standard "requires that a plaintiff draw a 'meaningful connection' between [his] due process injury and the use of fabricated evidence against [him]."  Black, 835 F.3d at 372.  Finally, to sustain such a claim there must be "'persuasive evidence supporting a conclusion that the proponents of the evidence [were] aware that the evidence is incorrect or that the evidence [was] offered in bad faith.'"  Boseman v. Upper Providence Twp., 680 F. App'x 65, 70 (3d Cir. Feb. 27, 2017) (quoting Black, 835 F.3d at 372).  Allegations generally describing such evidence must be present in a pleading to survive a motion to dismiss.  Id.

　　　　Here, the complaint establishes a reasonable likelihood that without the allegedly fabricated evidence, Plaintiff would not have been criminally convicted.  Plaintiff has alleged that Defendant Prosecutors helped fabricate the statements and testimony of Elderkin, Dennis Fogle, Pearce, Stewart and Klingensmith.  Commencing with the orchestrated hypnosis producing Elderkin's new statement in a case that otherwise lacked probable cause of plaintiff's involvement and using that as a means of generating other statements through coercive and other prohibited tactics, the complaint plausibly sets forth facts that directly state or reasonably imply that the Defendant Prosecutors assisted in the fabrication of evidence that was essential to maintaining the charges against plaintiff's and securing his conviction.  Given this state of affairs, moving defendants' efforts to seek shelter in the fact that some of the evidence was suppressed is misplaced.  Cf. Thomas v. City of Phila., -- F.Supp.3d --, 2018 WL 684836, at *10 (E.D. Pa. 2018) (a claim for fabrication of evidence had been sufficiently pled where "photos were used to shore up a weakening case and dissuade a wavering prosecutor from dropping the charges").  Accepting Plaintiff's allegations as true, there are sufficient grounds to establish a "meaningful connection" between the Defendant Prosecutors' involvement in the fabricated

evidence and his conviction. Thus, the allegations are sufficient to state a plausible due process claim against the moving defendants.

*Absolute Immunity*

Given this backdrop, the moving defendants do not enjoy absolute immunity as to all aspects of their alleged conduct. As a general matter, prosecuting attorneys are absolutely immune from suits for damages under § 1983 based on activities that are "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430 (1976). "But a person is not immune from suit for every wrong he commits just because he happens to be employed as a prosecutor: the inquiry focuses on the nature of the function performed, not the identity of the actor who performed it." Schneyder v. Smith, 653 F.3d 313, 332 (3d Cir. 2011) (internal citation and quotation omitted); accord Odd v. Malone, 538 F.3d 202, 208 (3d Cir. 2008).

Absolute immunity extends to both "activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out-of-court behavior 'intimately associated with the judicial phases' of litigation." Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992) (quoting Imbler, 424 U.S. at 430). In contrast, actions taken by a prosecutor "in an investigative or administrative capacity" do not garner absolute immunity and are protected only by qualified immunity. Id.

Moreover, "a determination of probable cause does not guarantee a prosecutor absolute immunity." Buckley v. Fitzsimmons, 509 U.S. 259, 275 n.5 (1993). Instead, in assessing whether absolute immunity applies, a "court must ascertain just what conduct forms the basis for the plaintiff's cause of action, and it must then determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served." Schneyder, 653 F.3d at

16

332 (emphasis added); see also B.S. v. Somerset Cnty., 704 F.3d 250, 270 (3d Cir. 2013) (explaining "[t]he key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the [individual] occupies in carrying it out") (emphasis added).

A prosecutor bears the "heavy burden" of establishing entitlement to absolute immunity. Light v. Haws, 472 F.3d 74, 80-81 (3d Cir. 2007) (quoting Forsyth v. Kleindienst, 599 F.2d 1203, 1212 (3d Cir. 1979)). In light of the Supreme Court's "quite sparing" admonishment regarding the use of absolute immunity, the court is to begin with the presumption that qualified rather than absolute immunity is appropriate. Carter v. City of Phila., 181 F.3d 339, 355 (3d Cir. 1999) (citing Burns v. Reed, 500 U.S. 478, 486-87 (1991)).

Here, the complaint and the reasonable inferences drawn from its averments of fact plausibly indicate that DA Olson directly participated in the generation of a statement from "spaceman" Elderkin while he was under hypnosis. DA Olson was involved in arranging the services of the unqualified hypnotist and the session itself. DA Olson's direct involvement in the generation of this evidence also can be inferred from the location where the session occurred, the Indiana Borough Police Department – a location under the control of the County and not the Pennsylvania State Police. From this it is likewise reasonable to infer that DA Olson had knowledge of the numerous inconsistent statements Elderkin had given, his psychiatric hospitalization in the proceeding days, and his inability to provide a coherent and credible account of his memories.

The averments of fact likewise support the view that there is a reasonable expectation that discovery will reveal that DA Olson oversaw and participated in the gathering of the statements used to corroborate Elderkin's new statement. For example, the complaint avers and it is

reasonable to infer that DA Olson was involved in nailing down Dennis Fogle's solidified confession and the inculpatory accounts from the jailhouse informants.

The amended complaint similarly contains sufficient factual averments to make a plausible showing that ADA Martin also participated in the fabrication of evidence. Its averments do fall short of identifying specific pre-indictment actions undertaken by ADA Martin. Nevertheless, it implicitly indicates he was involved in the obtaining of Elderkin's new statement and the statements of Dennis Fogle and Patty Long generated immediately thereafter, all of which can be characterized as pre-indictment investigatory activity under the controlling standards of review. See Yarris v. County of Delaware, 465 F.3d 129, 137 (3d Cir. 2006) (activities by a prosecutor occurring before his or her role as an advocate has begun generally do not enjoy prosecutorial immunity); accord Odd, 538 F.3d at 210 (same). At the latest, ADA Martin learned of the full circumstances surrounding the taking of Elderkin's new statement at the preliminary hearing. And it is averred that he thereafter knew about, encouraged and acted in concert with the defendant officers to generate the jailhouse statements to corroborate Elderkin's new statement.

It is reasonable to infer that ADA Martin had direct involvement during at least some of these events. At the very least, there is a reasonable expectation that discovery will reveal evidence of his direct involvement in the investigatory activities at issue. And because the averments of the complaint do not unequivocally demonstrate that ADA Martin's actions were limited to his role as the state's advocate, blanketing them with prosecutorial immunity is inappropriate. See Yarris, 465 F.3d at 138-39 (prosecutors not entitled to absolute immunity at the pleading stage where it could not be discerned from the complaint "whether the fabrication of Yarris's confession occurred during the preliminary investigation of an unsolved crime [or] after

18

the [prosecutors] decided to indict Yarris and began working as the state's advocates"); Guzman-Rivera-Cruz v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995) ("The prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches.") (citing Burns, 500 U.S. at 495) ("Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."); accord Odd, 538 F.3d at 213.[6]

It follows that absolute immunity does not bar Plaintiff's fabrication of evidence claims against Defendant Prosecutors because when the statements were fabricated, a reasonable inference can be drawn that the prosecutors had at least some meaningful direct involvement in the undertaking and were acting in an investigatory capacity. Therefore, Defendant Prosecutors motion as to this count must be denied.

Civil Conspiracy

Defendant Prosecutors' challenge to plaintiff's civil conspiracy claim on the basis of prosecutorial immunity is wide of the mark for the same reasons. Plaintiff asserts civil conspiracy claims against these defendants for fabrication of the statements of Elderkin, Patty Long, Dennis Fogle, Pearce, Stewart, and Klingensmith.

---

[6] Of course, this ruling does not preclude a more specific assessment of the particular acts revealed through discovery. See, e.g., Munchinski v. Solomon, -- F. App'x --, 2018 WL 4090881, *2 (3d Cir., Aug. 28, 2018) (Smith, C.J.) (opining at summary judgment that "[b]ecause absolute immunity attaches not to the prosecutor as an individual, but to the nature of the function pursuant to which he acts, we evaluate each action that forms the basis of the suit. We determine, as a matter of law, whether they took place as part of the prosecutor's role as an advocate for the state, or were more properly considered investigative, administrative, or otherwise not an exercise of the prosecutorial role.").

To advance a § 1983 conspiracy claim, a plaintiff must aver "factual allegations of combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events." Pellegrino, 136 F. Supp.2d at 409 (citing Hammond v. Creative Financial Planning Org. Inc., 800 F. Supp. 1244, 1249 (E.D. Pa. 1992)). There must be an agreement of two or more persons to "do a criminal act, or to do [a lawful] act by unlawful means or for an unlawful purpose." Id. (citing Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997) (citing Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974) ("A civil conspiracy is combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose.") (citing Landau v. Western Pennsylvania National Bank, 282 A.2d 335 (Pa. 1971)).

Read as a whole, the averments set forth a plausible claim that the Defendant Officers and Defendant Prosecutors worked together to generate evidence to build a case on Elderkin's new statement where probable cause did not otherwise exist and sought to plug the many holes that arose as the case unfolded through the use of prohibited or highly questionable means. Given the averments that plausibly set forth these circumstances, prosecutorial immunity does not bar plaintiff's claims against Defendant Prosecutors for conspiracy to fabricate evidence claims. See Odd, 538 F.3d at 209 (extending prosecutorial immunity to activities undertaken in the investigative phase of a criminal case "would eviscerate the rule that a prosecutor's administrative and investigatory acts are not absolutely immune because '[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute.'") (quoting Burns, 500 U.S. at 495). Although Patty Long's statement was not previously addressed, a reasonable

inference can be drawn that absolute immunity likewise does not bar Plaintiff's conspiracy to fabricate evidence claim on the basis of this statement. At the time this statement assertedly was fabricated, the prosecutors plausibly were acting in an investigatory capacity. Therefore, Defendant Prosecutors' motion as to this count must be denied.

Failure to Intervene

Defendant Prosecutors' attempt to foreclose Plaintiff's failure to intervene claim at this stage is insidious. Defendants forcefully argue that as district attorney and assistant district attorney, they had no authority over the other officers involved, who were state police officers. They contend that any conduct by those officers truly was distinct from their own involvement and from their perspective there is a complete absence of authority for recognizing any such duty under the "facts" of the complaint as they construe them. And because they did not have the ability to order, oversee or otherwise control those officers' conduct, they purportedly could not have intervened and directed the officers to do or refrain from doing anything. Consequently, they argue that the law falls short of placing any duty on them vis-a-vis the Officer Defendants' conduct, and a claim for failure to intervene in any undertaking which involved a violation of plaintiff's constitutional rights cannot proceed against them.

Plaintiff posits that the existing law does support a failure to intervene claim against these defendants. In this regard moving defendants worked side-by-side with the Officer Defendants in creating a case around Elderkin's new statement and they had the ability to intervene in misconduct that was occurring in their presence.

Defendant Prosecutors' position fails to accord proper recognition to the nature and underpinnings of a § 1983 failure to intervene claim. A duty to intervene generally exists where a defendant fails or refuses to intervene when a constitutional violation is taking place in his or

her presence.  Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  It likewise extends to violations by individuals acting under one's supervision where there is knowledge of the violation and acquiescence in the treatment.  Id. at 651 (acknowledging that in Baker v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995), the court expanded the scope of failure to act liability to a senior police officer for the use of excessive force in executing a search warrant where "there [was] sufficient evidence to permit an inference that [the officer] knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers acting under his supervision.")  (quoting Baker, 50 F.3d at 1193).  A critical requirement is that the defendant have a realistic and reasonable opportunity to intervene.  Id. (citing Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981); and Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972)).

The garden-variety § 1983 claim for failure to intervene had its origins in claims against police officers.  Id. at 650 (collecting cases).  The typical claim was one for use of excessive force in violation of the Fourth Amendment.  Id.  ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.") (quoting Byrd, 783 F.2d at 1007).   In Smith, the court had little reservation in extending the reach of the constitutional tort to corrections officers within a penal institution on the grounds, among other things, that the security concerns of a penal institution did not "suggest a different Eighth Amendment inquiry for corrections officers as opposed to police officers."  Id.  In both cases, the law does not permit either officer to "condone or cover up the" constitutional violation and "neither can escape liability by turning either a blind eye or deaf ear to the illegal conduct of their colleagues." Id. at 652.

Here, Defendant Prosecutors fail to acknowledge the nature of the conduct which underlies the claims that survive their motion. To the extent their conduct essentially was "intimately associated with the judicial phase of the criminal process," it is entitled to the protections from suit afforded by prosecutorial immunity. Odd, 538 F.3d at 212 (quoting Imbler, 424 U.S. at 430). Plaintiff does not seriously contend otherwise. What Defendant Prosecutors are being held to answer is predicated on their investigative activities which occurred before judicial proceedings had been initiated. Such conduct is not protected by absolute immunity, but instead is sufficiently shielded from mischief through qualified immunity. Id. at 209. The United States Supreme Court and the United States Court of Appeals for the Third Circuit repeatedly have recognized this principle. Id. at 208-12 (outlining the seminal cases considering the contours and perimeters of prosecutorial immunity). In both Burns v. Reed, 500 U.S. 478 (1991) and Buckley v. Fitzsimmons, 509 U.S. 259 (1993), the Court made clear that investigative activities by prosecutors such as advising law enforcement officers about the use of hypnosis to obtain evidence of probable cause for an arrest warrant and fabricating evidence to obtain an indictment were purely investigative activities. Burns, 500 U.S. at 482-83; Buckley, 509 U.S. at 275-76. Similarly, the Third Circuit has recognized that within the functional inquiry certain forms of conduct such as destroying exculpatory evidence and fabricating a false confession before initiating charges are the types of investigatory conduct that are beyond the reach of absolute immunity, whereas obtaining a false statement from a jailhouse informant after indictment is protected from suit. Odd, 538 F.3d at 210-11 (discussing Yarris, 465 F.3d at 134 and Kulwicki v. Dawson, 969 F.2d 1454, 1459 (3d Cir. 1992)).

In undertaking the functional analysis that informs the scope of absolute immunity, what becomes evident from a review of these cases is that where a prosecutor is engaging in the types

of investigatory activities that are beyond absolute immunity protections, he or she is acting in a law enforcement capacity and is to be treated with the protections afforded any other law enforcement officer. We fail to see sound reason for treating them differently with respect to the constitutional tort of failure to intervene.

Moreover, the underpinnings for recognizing a § 1983 cause of action for failure to intervene support its extension to prosecutorial activity clearly undertaken as an investigatory function where that activity otherwise would support the claim against any other law enforcement officer. In considering whether a failure to intervene claim should be extended to prison guards with regard to the use of force, our court of appeals reasoned:

In <u>Baker v. Monroe Township</u>, 50 F.3d 1186 (3d Cir.1995), we held that a police officer who was the senior officer involved in executing a search warrant could be liable in a suit under § 1983 even though he did not personally use excessive force, nor direct anyone else to. We concluded that "there [was] sufficient evidence to permit an inference that [the officer] knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers acting under his supervision." <u>Baker</u>, 50 F.3d at 1193. The specific circumstances in <u>Baker</u> required us to determine if the plaintiff had shown that the senior officer had "actual knowledge and acquiescence." <u>Id.</u> at 1194, quoting <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir.1988). Although the specific context of our analysis only involved an officer's liability for the actions of police officers under his supervision, we do not interpret <u>Baker</u> as suggesting that liability for failure to intervene is solely limited to supervisors or officers who outrank their offending colleagues.

The duty to uphold the law does not turn upon an officer's rank. It is neither affected by, nor proportional to, a non-intervening officer's relationship to an offending colleague. The approving silence emanating from the officer who stands by and watches as others unleash an unjustified assault contributes to the actual use of excessive force, and we cannot ignore the tacit support such silence lends to those who are actually striking the blows. Such silence is an endorsement of the constitutional violation resulting from the illegal use of force. It is incompatible with the restrictions imposed under the Eighth Amendment, and is therefore unacceptable. We will not immunize such conduct by suggesting that an officer can silently contribute to such a constitutional violation and escape responsibility for it. The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs.

Although our case law refers to police officers, not corrections officers, this does not change our analysis. Both are law enforcement officers, both are sworn to uphold the law, and both are authorized to use force (even deadly force) toward that end. We are, of

course, aware of the obvious security concerns inside the close confines of a prison. However, that is simply one factor that must be considered in determining if a particular application of force is reasonable. It does not suggest a different Eighth Amendment inquiry for corrections officers as opposed to police officers. The law does not allow either to condone or cover up the use of excessive force. Similarly, neither can escape liability by turning either a blind eye or deaf ear to the illegal conduct of their colleagues.

Smith, 293 F.3d at 651-52.

The instant case has a number of similar factors that give rise to analogous concerns. First, Defendant Prosecutors enjoy prosecutorial immunity for all aspects of their conduct which were intimately associated with the judicial process. As a result, they are only being burdened with the need to justify and defend their course of conduct that can be narrowly defined and thereafter construed as investigative conduct. On this level Defendant Prosecutors are law enforcement officers who were sworn to uphold the law and were bound to use their authority to secure evidence capable of producing a lawful conviction.

Moreover, both moving defendants were law enforcement officers in relationship to each other, and the fact that they were working jointly with state police officers does not undermine their reciprocal relationship with each other. On this basis alone the effort to defeat the claim on the lack of a hierarchical relationship within a single law enforcement unit is unavailing. In addition, to the extent the record supports the construction that Defendant Prosecutors were directly involved in or had first-hand knowledge of the undertakings of the other law enforcement officers working the case, their failure to intervene as to what objectively would be recognized as unconstitutional conduct by any officer acting reasonably in the investigation, that first-hand involvement should not be shielded merely by the office they held. After all, their "duty to uphold the law does not turn upon their rank [and] neither [was it] affected by, nor proportional to, [their] . . . relationship to [the] offending colleague." Smith, 293 F.3d at 609.

25

The nature of the averred conduct likewise supports the extension we choose to recognize today. Plaintiff has not predicated his lawsuit on an innocuous constitutional violation. The conduct here is the direct and purposeful undertaking to fabricate evidence through the use of informal hypnosis and coerced confessions to gain a basis for a probable cause determination where it was known to not exist. The approving silence emanating from a prosecutor who contributes to such efforts or otherwise stands by and watches as others unleash such corruptive tactics contributes to the actual fabrication of evidence, and it cannot be denied that the tacit support created by such silence lends encouragement and signals authorization to those who are actually engaging in the repugnant conduct. "Such silence is an endorsement of the constitutional violation" on an equal level. Id. at 651.

And the invaded interest is one that is at the core of our constitution. Plaintiff's liberty interest in his freedom from unconstitutional constraint is a central value within the concept of due process. In many ways the protections of the Fourth and Sixth Amendment are intended to augment the core values encompassed with the concept of ordered liberty. If a law enforcement officer's duty to intervene extends to an obvious use of excessive force in violation of the Fourth Amendment, it surely must follow *a fortiori* that it extends to the fabrication of evidence in violation of the Fourteenth Amendment's Due Process Clause. Just as the law prohibits efforts by a law enforcement officer to condone or cover-up such conduct, it does not, without more, permit that same officer to "escape liability by turning either a blind eye or deaf ear to the illegal conduct of [his or her] colleagues." Id. at 652. Accordingly, Defendant Prosecutors are not entitled to dismissal of the failure to intervene claim.

Monell Claim

Defendant County of Indiana's efforts to gain dismissal at this stage of the proceedings are unavailing. An entity such as the County may be found liable under section 1983 for a constitutional violation "where the [entity] itself causes the constitutional violation at issue." City of Canton v. Harris, 489 U.S. 378, 385 (1989).

Whether a constitutional violation by a municipal entity can be established under § 1983 is governed by the doctrine announced in Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). There, the Supreme Court held that "[a] municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011). But such entities "are responsible only for 'their own illegal acts'" and are not vicariously liable for the acts of their employees. Id. (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)). In other words, liability against such an entity may not be established by the *respondeat superior* doctrine, but instead must be founded upon evidence indicating the government itself supported a violation of the plaintiff's constitutional rights through the implementation of a municipal policy or custom. Monell, 436 U.S. at 691; see also Bielevicz v. Dubinon, 915 F.3d 845, 850 (3d Cir. 1990) ("municipal liability attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury") (quoting Monell, 436 U.S. at 694).

In order to establish municipal liability a plaintiff must prove that "action pursuant to official municipal policy" actually caused the deprivation of a federal right. Connick, 563 U.S. at 60-61 (quoting Monell, 436 U.S. at 691). Official municipal policy includes 1) formal policy, 2) acts of official policymakers and 3) "practices so persistent and widespread as to practically

have the force of law." Id. at 61 (collecting cases). Only "[t]hese are 'action[s] for which the municipality is actually responsible.'" Connick, 563 U.S. at 61 (quoting Pembaur, 475 U.S. at 479-80).

Proving a government policy or custom can be accomplished in a number of different ways. Bielevicz, 915 F.2d at 850; Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997) (to proceed on a Monell claim a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (alteration in Andrews) (quoting Pembaur, 475 U.S. at 481). Custom, in contrast, can be proven by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well-settled and permanent as virtually to constitute law. Id. "Custom stems from policymakers' 'acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.'" Wright, 685 F. App'x at 147 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)).

It has long been recognized that a single act or event may subject an entity to liability under Monell. In Pembaur v. Cincinnati, 475 U.S. 469 (1986), the Supreme Court established the principle that

> it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body — whether or not that body had taken similar action in the past or intended to do so in the future — because even a single decision by such a body unquestionably constitutes an act of official government policy.

475 U.S. at 480.  To utilize this approach there must be a basis in the record to establish that the official whose decision is in question had final policy-making authority for the governmental entity with regard to the specific matter at hand.  Id.

In order to prove that an individual acted with the final policy-making authority in taking any particular governmental action, a party must show that (1) as a matter of state law, the official is responsible for making policy in the particular area of municipal action in question, McMillian v. Monroe County, 520 U.S. 781, 785 (1997) and City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988), and (2) the official's authority to make policy in that area is final and unreviewable.  Praprotnik, 485 U.S. at 127 ("the authority to make municipal policy is necessarily the authority to make final policy") (citing Pembaur v. Cincinnati, 475 U.S. 469, 481–484 (1986)); accord Hill v. Borough of Kutstown, 455 F.3d 225, 245-46 (3d Cir. 2006); Mulholland v. Gov't Cty. of Berks, Pa, 706 F.3d 227, 237 (3d Cir. 2013) ("An official has policymaking authority for Monell purposes when the official is responsible as a matter of state law for making policy in the particular area of county business in question, and the official's authority to make policy in that area is final and unreviewable.").  In contrast, "if a municipal employee's decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of [constituting official action or policy]." Brennan v. Norton, 350 F.3d 399, 428 (3d Cir. 2003).

Identifying those individuals who can establish official policy in a particular municipal setting is a question of law for the court to determine.  Jett, 491 U.S. at 737.  The United States Court of Appeals for the Third Circuit has recognized that under Pennsylvania Law, district attorneys are the "'chief law enforcement officer[s] for the county in which [they were] elected.'"  Carter v. City of Phila., 181 F.3d 339, 349 (3d Cir.1999) (quoting 71 P. S. § 732-206)

(alterations in original).[7]  Nevertheless, they actually occupy a hybrid status in fulfilling the various functions of the office: in making decisions concerning whether to prosecute and, if so, what charges to bring, and in taking actions in the presentation of a case before a judicial tribunal and other conduct intimately involved with the judicial phases of prosecution, they act as agents of the state; but when called upon to perform tasks beyond "their strictly prosecutorial functions," they serve as local policymakers for the county in which they are elected.  Id. at 352–53, 56.  As to these county functions, which encompass the remaining duties of the office, they often function as a final policymaker for the county.  Id. at 353 (citing Esteves v. Brock, 106 F.3d 674, 678 (5th Cir. 1997) ("A county official 'pursues his duties as a state agent when he is enforcing state law or policy'" by conducting trials; but "[f]or those [remaining] duties that are administrative or managerial in nature, . . . a district attorney . . . functions as a final policymaker for the county.") (quoting Echols v. Parker, 909 F.2d 795, 801 (5th Cir. 1990)).  These functions extend to decisions and policies regarding the implementation or use of investigative procedures and techniques.  Id. at 352 (citing Myers v. County of Orange, 157 F.3d 66, 77 (2d Cir. 1998)).

Plaintiff has averred that there was an affirmative County policy established by DA Olson's actions and it was to manufacture evidence where there was otherwise a complete lack of it to support the adopted theory of the case.  It is averred as fact that DA Olson made the investigative decision to utilize hypnosis to sure-up what was an otherwise incredible account by an individual whom was unreliable and untrustworthy.  It further is alleged as fact that several

---

[7]  The district attorneys of Pennsylvania's sixty-seven counties are elected officials who serve four year terms.  53 Pa. C. S. § 13152.  They are county rather than state officers under Article IX, § 4 of the Pennsylvania Constitution.  See Pa. Const., Article IX, Section 4 ("County officers shall consist of . . . district attorneys . . . and such others as may from time to time be provided by law.").

other techniques known to be unconstitutional or to produce unreliable results were employed at the direction or at least with the knowledge and acquiescence of DA Olson to produce evidence that would support the incredible account of an individual whom everyone involved had reason to believe lacked reliability and/or credibility.

Of course, prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." Connick, 563 U.S. at 71. And both the Supreme Court and our Court of Appeals have recognized that engaging in investigative activities such as providing legal advice or guidance to law enforcement during the course of an investigation falls within a district attorney's administrative or managerial functions. Carter, 181 F.3d at 356 & n. 58; Giuffre v. Bissell, 31 F.3d 1241, 1253 (3d Cir.1994); Burns, 500 U.S. at 496; Cf. Imbler, 424 U.S. at 430 (investigative activities by a prosecutor are beyond those which form an integral part of the judicial process).

When a district attorney engages in investigative activities he or she acts as the chief law enforcement officer for the county. And when those activities involve the implementation of techniques or undertakings which are designed to fabricate evidence, a policy that garners constitutional concern has been adopted by a county policymaker with final authority on the matter. And this is so even if it is only in a single case. Pembaur, 475 U.S. at 480. Under these circumstances the county may be understood to be bound by the conduct of the district attorney for the purposes of a motion to dismiss. See Hill, 455 F.3d at 245-46 (valid Monell claim for deprivation of a liberty interest in reputation and violation of the First Amendment had been stated where the mayor was the "final policymaker capable of binding the Borough with his conduct when it came to constructively discharging [the plaintiff]" and the plaintiff was constructively discharged); Ecotone Farm LLC v. Ward, 639 F. App'x 118, 127-28 (3d Cir. Jan.

28, 2016) (the plaintiff had a <u>Monell</u> claim against Harding Township for violating his right to equal protection of the law with regard to the enforcement of the soil disturbance ordinance where the Township's soil disturbance ordinance gave the township engineer final decision-making authority to enforce the ordinance and he had acted to enforce it).

Plaintiff has alleged facts that plausibly set forth the adoption of a policy that was geared toward generating evidence in a manner that violated plaintiff's rights to due process. The policy was implemented by the individual who had final policymaking authority for the County in the undertakings in question. Facts supporting the inference that discovery will reveal evidence to support a finding that the policy caused plaintiff's wrongful conviction have been alleged. Consequently, Defendant County of Indiana's motion to dismiss this count must be denied.

Malicious Prosecution

Plaintiff has withdrawn Count I (federal malicious prosecution) and Count VII (state malicious prosecution) against the Defendant Prosecutors. These claims will be dismissed against these defendants.

*Respondeat Superior*

*Respondeat superior* is not a separate cause of action in Pennsylvania. <u>Robinson v. Folino</u>, Civ. Act. No. 14-227, 2017 WL 956648, at *5 (W.D. Pa. Mar. 13, 2017). As a result, this count will be dismissed.

For the reasons set forth above, Defendant Prosecutors' motion to dismiss will be granted

in part and denied in part.  An appropriate order will follow.

<u>Date: December 28, 2018</u>

<u>s/David Stewart Cercone</u>
David Stewart Cercone
Senior United States District Judge

cc: Thomas J. Farrell, Esquire
   Emma Freudenberger, Esquire
   Peter Neufeld, Esquire
   Vishal Agraharkar, Esquire
   Peter Neufeld, Esquire
   Mary Lynch Friedline, Esquire
   Michael Kennedy, Esquire
   Maria Milie Jones, Esquire
   Michael R. Lettrich, Esquire

   (*Via CM/ECF Electronic Mail*)